**Nos. 7:19-cv-07660 (VB); 19-cv-07782; 19-cv-07697**

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

ESL INVESTMENTS, INC., ET AL., CYRUS CAPITAL PARTNERS, L.P., AND WILMINGTON TRUST, NATIONAL ASSOCIATION, AS INDENTURE TRUSTEE AND COLLATERAL AGENT

*Appellants,*

– v. –

SEARS HOLDINGS CORPORATION, ET AL.,

*Appellees.*

## ON APPEAL FROM THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK (DRAIN, J.)

## IN RE SEARS HOLDINGS CORPORATION, ET AL, CASE NO. 18-23538

## REPLY BRIEF FOR APPELLANTS

| | |
|---|---|
| CLEARY GOTTLIEB STEEN & HAMILTON LLP | WILMER CUTLER PICKERING HALE AND DORR LLP |
| Thomas J. Moloney | Philip D. Anker |
| Sean A. O'Neal | 7 World Trade Center |
| Andrew Weaver | 250 Greenwich Street |
| Katherine R. Lynch | New York, New York 10006 |
| Chelsey Rosenbloom | Tel. (212) 230-8800 |
| One Liberty Plaza | Fax (212) 230-8888 |
| New York, New York 10006 | philip.anker@wilmerhale.com |
| Tel. (212) 225-2000 | |
| Fax (212) 225-3999 | |
| tmoloney@cgsh.com | |

*Attorneys for Appellants ESL Investments, Inc., JPP, LLC, and JPP II, LLC*

MILBANK LLP
Eric R. Reimer (admitted *pro hac vice*)
Thomas R. Kreller (admitted *pro hac vice*)
Robert J. Liubicic
2029 Century Park East, 33rd Floor
Los Angeles, California 90067
Tel. (424) 386-4000
Fax (231) 629-5063
tkreller@milbank.com

*Attorneys for Appellant Cyrus Capital Partners, L.P.*


SEYFARTH SHAW LLP
Edward M. Fox
Steven Paradise
Owen Wolfe
620 Eighth Avenue
New York, NY 10018
Tel. (212) 218-4646
Fax (917) 344-1339
emfox@seyfarth.com

*Attorneys for Appellant Wilmington Trust, National Association,
as indenture trustee and collateral agent*

# TABLE OF CONTENTS

**PAGE**

INTRODUCTION ....................................................................................1

ARGUMENT...........................................................................................2

I.  Appellees Concede Bankruptcy Court Failed to Calculate the
Replacement Cost of the Inventory Collateral as Mandated by
*Rash*.....................................................................................................2

A.  *Rash* Requires That Collateral Retained by the Debtor to
Generate Income in a Going Concern be Valued at its
Replacement Cost to the Debtor................................................3

B.  The Bankruptcy Court's Decision Was Infected By its
Legally Erroneous Choice of Valuation Methodology ...........12

II.  Appellees Brief Confirms That The Bankruptcy Court's
Other "Adjustments" Were Improper...............................................18

A.  Appellees Failed To Meet Their Burden To Establish That
The Stand-By Letters Of Credit Would Be Drawn..................18

B.  Post-Petition Interest Should Not Be Deducted From The
Second-Lien Collateral Value At The Petition Date ...............25

C.  Credit Card Receivables.........................................................29

D.  Pharmacy Scripts ...................................................................30

E.  The Bankruptcy Court's Deduction Of Overhead Costs
From The Second-Lien Collateral Value Cannot Be
Justified And Was Error..........................................................32

F.  Ineligible Inventory................................................................34

G.  Cash........................................................................................36

III.  The Bankruptcy Court Erred in Ruling that the Plain Text of the APA Creates a $50 Million Cap on ESL's Recovery on Account of its Claims Under Section 507(b) of the Bankruptcy Code .................................................................................................38

CONCLUSION ............................................................................41

CERTIFICATE OF COMPLIANCE...............................................44

60852734v.3

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Aerogroup International*,
601 B.R. 571 (Bankr. D. Del. 2019)..................................................35

*Assocs. Commercial Corp. v. Rash*,
520 U.S. 953 (1997)...............................................................*passim*

*Broadcom Corp. v. Qualcomm Inc.*,
2005 WL 5925584 (C.D. Cal. Oct. 19, 2005)....................................33

*In re Coated Sales, Inc.*,
144 B.R. 663 (Bankr. S.D.N.Y. 1992)...............................................15

*Conway Hosp., Inc. v. Lehman Bros. Holdings,Inc.*,
531 B.R. 339 (S.D.N.Y. 2015) ..........................................................39

*FDIC v. Philadelphia Gear Corp.*,
476 U.S. 426 (1986)..........................................................................19

*In re Goldstein*,
194 B.R. 1 (Bankr. D. Mass. 1996) ...................................................21

*In re Heritage Highgate, Inc.*,
679 F.3d 132 (3d Cir. 2012)................................................................6

*Int'l Star Class Yacht Ass'n v. Tommy Hilfiger U.S.A., Inc.*,
146 F.3d 66 (2d Cir. 1998)................................................................24

*In re Iridium Operating LLC*,
373 B.R. 283 (Bankr. S.D.N.Y. 2007)...............................................15

*Kayvsville City v. FDIC*,
557 F. App'x 719 (10th Cir. 2014).....................................................19

*Matter of King Res. Co.*,
651 F.2d 1326 (10th Cir. 1980).........................................................11

v

*In re Langley*,
   30 B.R. 595 (Bankr. N.D. Ind. 1983) ...............................................................27

*In re Lyondell Chem. Co.*,
   585 B.R. 41, 59 (S.D.N.Y. 2018) ....................................................................35

*LNC Invs., Inc. v. First Fid. Bank, N.A.*,
   247 B.R. 38 (S.D.N.Y. 2000)..........................................................................26

*In re M.D. Moody & Sons, Inc.*,
   2010 Bankr. LEXIS 5220 (Bankr. M.D. Fla. Mar. 5, 2010) ............................35

*M/V American Queen v. San Diego Marine Constr. Corp.*,
   708 F.2d 1483 (9th Cir. 1983)..........................................................................24

*In re Mazzeo*,
   167 F.3d 139 (2d Cir. 1999).............................................................................24

*In re Motors Liquidation Co.*,
   482 B.R. 485 (Bankr. S.D.N.Y. 2012).................................................................5

*In re Motors Liquidation Co.*,
   576 B.R. 325 (Bankr. S.D.N.Y. 2017)..........................................................6, 16

*Nat'l Rural Utilities Co-op. Fin. Corp. v. Wabash Valley Power
   Ass'n, Inc.*,
   111 B.R. 752 (S.D. Ind. 1990) .........................................................................11

*Nationwide Emerging Managers, LLC v. NorthPointe Holdings, LLC*,
   112 A.3d 878 (Del. 2015) ..........................................................................31, 32

*In re Polries Bros.*,
   49 B.R. 669 (D.N.D. 1985) ..............................................................................26

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc.
   v. Anderson*,
   390 U.S. 414 (1968).........................................................................................11

*In re RadioShack Corp.*,
   2015 Bankr. LEXIS 4541 (Bankr. D. Del. Mar. 12, 2015) ..............................33

*In re Residential Capital, LLC*,
   501 B.R. 549 (Bankr. S.D.N.Y. 2013).........................................................5, 14

*Ridgemont Apartment Associates, Ltd. v. Atlanta English Village, Ltd.*,
110 B.R. 77 (N.D. Ga. 1989),
*aff'd*, 890 F.2d 1166 (11th Cir. 1989)...............................................26

*In re Rupprect*,
161 B.R. 48 (Bankr D. Neb. 1993)...............................................28

*In re Sabine Oil & Gas Corp.*,
555 B.R. 180 (Bankr. S.D.N.Y. 2016)...............................................5

*In re SK Foods, L.P.*,
487 B.R. 257 (E.D. Cal. 2013) ...............................................7

*In re Sunnyslope Hous. Ltd. P'ship*,
859 F.3d 637 (9th Cir. 2017),
*as amended* (June 23, 2017), *cert. denied*, 138 S. Ct. 648 (2018)...............10, 12

*U.S. v. Liew*,
2014 WL 554491 (N.D. Cal. Feb. 7, 2014) ...............................................15

*In re UAL Corp.*,
351 B.R. 916 (Bankr. N.D. Ill. 2006) ...............................................9

*United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs.*,
484 U.S. 365 (1988)...............................................26

*Urban Communicators PCS Ltd. P'ship v. Gabriel Capital, L.P.*,
394 B.R. 325 (S.D.N.Y. 2008) ...............................................14

*In re Valenti*,
105 F.3d 55 (2d Cir. 1997)...............................................8

*In re Westpointe, L.P.*,
234 B.R. 431 (E.D. Mo. 1999),
*aff'd*, 241 F.3d 1005 (8th Cir. 2001) ...............................................12

*In re Winthrop Old Farm Nurseries, Inc.*,
50 F.3d 72 (1st Cir. 1995)...............................................4, 16

*Wright v. Union Central Life Ins. Co.*,
311 U.S. 273 (1940)...............................................26

vii

*In re Xonics Photochemical, Inc.*,
    841 F.2d 198 (7th Cir. 1988) ............................................................... 19, 22, 24

**Statutes**

11 U.S.C. § 361(2) ...................................................................................28

11 U.S.C. § 362(a) ...................................................................................26

11 U.S.C. § 1129(b) ...................................................................................4

11 U.S.C. § 506(a) ............................................................. 2, 3, 4, 5, 7, 8, 16

11 U.S.C. § 506(c) ..............................................................................32, 33

**Other Authorities**

Black's Law Dictionary (11th ed. 2019) ...........................................................7, 8

C. Ryan Stewart, *Contingent Liabilities and Disputed Claims in the*
    *Context of a Bankruptcy Solvency Analysis,*
    Bankruptcy Valuation and Solvency Insights (Winter 2014)............................19

Fed. R. Evid. 201 ...................................................................................24

Fed. R. Evid. 602 ...................................................................................23

Fed. R. Evid. 703 ...................................................................................15

Fed. R. Evid. 801 ...................................................................................23

# INTRODUCTION[1]

There is no dispute that this case turns on the value of the Second-Lien Holders' Collateral as of the Petition Date.  Appellees attempt to defend the bankruptcy court's valuation, which they do not dispute was almost $200 million less than their own purported valuation, on the ground that it was a "fact-laden" determination and therefore subject only to clear error review.  Not so:  the bankruptcy court based its valuation on its use of net orderly liquidation value ("NOLV"), an approach that even Appellees criticized as legally unsound in their briefing and argument below.

The bankruptcy court's use of an NOLV valuation approach was inconsistent with the Supreme Court's holding in *Assocs. Commercial Corp. v. Rash*, 520 U.S. 953, 960 (1997), that replacement value, not liquidation value, is the test where, as here, the debtor uses the property and therefore legal error.  As set forth here and in the Second-Lien Brief, that fundamental legal error was compounded by a series of additional legal and clear factual errors, which included:  a) unjustifiably deducting hundreds of millions of dollars of value from the collateral for the satisfaction of L/C Facilities and theoretical post-petition interest debt, which the Debtors never incurred, b) charging the Second-Lien

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed in Appellants' opening brief ("Second-Lien Brief").  The Debtors' and the UCC's (collectively, "Appellees") opening brief is cited as ("Appellees Brief").

Holders for overhead expenses that were not their responsibility as a matter of law, and c) failing to credit or to include in the Second-Lien Holders' collateral package hundreds of millions of dollars of real collateral value, which the bankruptcy court either ignored or erroneously concluded was not included in the Second-Lien Holders' collateral grant.  Separately, the Court also erred in ruling that ESL's potential recoveries were somehow subject to a strict $50 million cap contrary to the language of the APA, which simply limited the sources for ESL's potential recoveries.  None of the myriad and inconsistent excuses offered by Appellees justify this decision, which should be reversed.

## ARGUMENT

### I.   APPELLEES CONCEDE BANKRUPTCY COURT FAILED TO CALCULATE THE REPLACEMENT COST OF THE INVENTORY COLLATERAL AS MANDATED BY *RASH*

Unable to defend an NOLV valuation approach, which Appellees themselves conceded in their briefing and argument to the bankruptcy court was legally incorrect and should have been "fair market value," A-1810, Appellees instead advance a grab bag of logically inconsistent theories regarding the proper valuation methodology under Bankruptcy Code Section 506(a).  At various points in their brief they claim that *Rash* does not govern, Appellees Brief at 44, that the bankruptcy court faithfully followed *Rash*, *id.* at 47, that the bankruptcy court was not required to calculate replacement value, *id.*, and that the bankruptcy court's

2

application of (or, alternatively, failure to apply) *Rash* was a pure factual finding not to be disturbed on appeal, *id.* at 24.  But, at bottom, they concede the basic point: the bankruptcy court did not value the inventory collateral on a replacement cost basis as mandated by *Rash*, but rather "use[d] NOLV".  *Id.* at 41.  The bankruptcy court's choice of NOLV valuation methodology was inconsistent with *Rash* and pure legal error.

### A.    *Rash* Requires That Collateral Retained by the Debtor to Generate Income in a Going Concern be Valued at its Replacement Cost to the Debtor

Contrary to Appellees' assertions, the Second-Lien Holders do not "view *Rash* as requiring a book value or retail valuation in all cases."  *Id.* at 26; *see also id.* at 43.  Rather, *Rash* mandates, consistent with the plain text of Section 506(a), that the methodology for valuing a secured claim depends on "the proposed disposition or use of such property," 520 U.S. at 960 (quoting Section 506(a))— namely, whether the debtor chooses to "to surrender the property or retain it," *id.* at 962.  Here, as in *Rash*, the Debtors, with respect to the collateral in the Go-Forward stores, "elected to use the collateral to generate an income stream."  *Id.* at 963.  That collateral therefore should have been valued, minimally, at its book value, which equated to its replacement cost.  *See* Second-Lien Brief at 54-55.  The collateral sold in the GOB stores was liquidated, so the proper valuation of that collateral under *Rash* was, minimally, the value realized by its sale, which, net of

3

selling costs, was slightly less than book value.  *See id*.  In both cases, the "actual use, *rather than a foreclosure sale that will not take place*, [was] the proper guide under a [statutory] prescription hinged to the property's 'disposition or use.'"  *Id.* (emphasis added).  As the Court explained in *Rash*:

> [T]he replacement-value standard accurately gauges the debtor's "use" of the property. It values "the creditor's interest in the collateral in light of the proposed . . . reality: no foreclosure sale and economic benefit for the debtor derived from the collateral equal to ... its [replacement] value."

*Id.* at 963 (alterations in original) (quoting *In re Winthrop Old Farm Nurseries, Inc.,* 50 F.3d 72, 75 (1st Cir. 1995)); *see also* Second-Lien Brief 45-53. Accordingly, *Rash* mandates, at the very least, the use of replacement value for the collateral sold in the Go-Forward stores, which Appellees confirm the bankruptcy court failed to apply, and the value actually achieved by the GOB sales, which the bankruptcy court also failed to apply.

Appellees' attempts to distinguish *Rash* and defend the bankruptcy court's legal analysis are unavailing.  *First*, they appear to argue—without legal support and contrary to post-*Rash* case law across the country—that *Rash* is limited to "cram-down" scenarios (proceedings on confirmation of plans of reorganization in which the debtor seeks to "cram-down" the plan on a dissenting class of creditors pursuant to 11 U.S.C. § 1129(b)).  Appellees Brief at 29 n.7; *see also id.* at 43, 46. Although *Rash* concerned a cram down, the Court interpreted the plain text of Bankruptcy Code Section 506(a), which is "a provision that applies *throughout* the

4

various chapters of the Bankruptcy Code; it is, in other words, a 'utility' provision that operates in many different contexts." *Rash*, 520 U.S. at 967 (Stevens, J., dissenting).

Appellees simply ignore the fact that courts performing valuation analyses under Section 506(a) post-*Rash* (including the bankruptcy court below) have recognized that *Rash*'s holding extends beyond the cram-down context to any valuation, including, as here, a 507(b) valuation.  *See* Second-Lien Brief at 46; *see also, e.g.*, *In re Residential Capital, LLC*, 501 B.R. 549, 592 (Bankr. S.D.N.Y. 2013) (applying *Rash* in the 507(b) context); *In re Sabine Oil & Gas Corp.*, 555 B.R. 180, 199 (Bankr. S.D.N.Y. 2016) (same); *see also In re Motors Liquidation Co.*, 482 B.R. 485, 492 (Bankr. S.D.N.Y. 2012) (holding that "*Rash*'s underlying thought process is still instructive" in calculating value in a § 363 sale).

*Second*, Appellees' attempt to distinguish *Rash* because the truck there was a "capital asset" rather than inventory collateral as here, Appellees Brief at 45-46, is likewise irrelevant.  The Supreme Court's decision in *Rash* does not turn on what the collateral is, but whether it will be retained and used by the debtor:

> Specifically, when a debtor, over a secured creditor's objection, seeks to retain and use the creditor's collateral in a Chapter 13 plan, is the value of the collateral to be determined by (1) what the secured creditor could obtain through foreclosure sale of the property (the "foreclosure-value" standard); (2) what the debtor would have to pay for comparable property (the "replacement-value" standard); or (3) the midpoint between these two

5

> measurements?  We hold that § 506(a) directs application
> of the replacement-value standard.

*Rash*, 520 U.S. at 955-56.  Because the Second-Lien Collateral was retained by the

Debtors, the Second-Lien Collateral must be valued at "what the debtor[s] would

have to pay for comparable property."  *Id.*

Moreover, as in *Rash*, the Debtors here used the collateral to generate

revenue.  The Debtors generated $3.3 billion in revenue from the sale of Second-

Lien Collateral inventory at retail between the Petition Date and the Sale Date,

A-2363; A-3504; A-3500, and used those proceeds to purchase an additional $1.1

billion of new inventory for their Go-Forward stores, A-3504, A-3500.  As

Appellees concede, "the Debtors needed to use the collateral (which included

Sear's inventory) during the pendency of these cases to maximize the value of the

estates."  Appellees Brief at 9.  The bulk sale to Transform, which ultimately

occurred, generated $5.2 billion in value, and required, as a condition to closing,

the delivery of $1.67 billion in inventory and receivable collateral.  *See* Second-

Lien Brief at 15-17.  "Courts have consistently held that when assets are sold in

bankruptcy 'as part of the business as a going concern,' 'going-concern' value, as

opposed to liquidation value, is appropriate under section 506(a)(1) and *Rash*."  *In*

*re Motors Liquidation Co.*, 576 B.R. 325, 423–24 (Bankr. S.D.N.Y. 2017), *leave to*

*appeal denied sub nom. Motors Liquidation Co. v. JPMorgan Chase Bank, N.A.*,

No. 17-CV-8712(AJN), 2018 WL 4284286 (S.D.N.Y. Sept. 7, 2018); *see also In re*

6

*Heritage Highgate, Inc.*, 679 F.3d 132, 141–42 (3d Cir. 2012) ("Where a Chapter 11 plan of reorganization provides for a debtor to retain and use collateral to generate income with which to make payments to creditors, a § 506(a) valuation based upon a hypothetical foreclosure sale would not be appropriate, as it would be inconsistent with the provision's dictates."); *In re SK Foods, L.P.*, 487 B.R. 257, 262 (E.D. Cal. 2013) (going concern valuation appropriate where debtor used "the creditors' cash collateral, enabling the debtor to keep running the business, and in contemplation of the going-concern sale").

*Third*, Appellees assert, without any support, that the bankruptcy court did not erroneously apply foreclosure value because "NOLV is not equivalent to foreclosure value." Appellees Brief at 47. Notably, the expert report that the bankruptcy court purportedly chose to follow stated that NOLV "assumes a firm-wide liquidation" and therefore reflects the value of the collateral in the context of an immediate sale of such collateral. *See* A-1999 (Murray Report). But NOLV is plainly not the equivalent of any form of replacement value. *See Rash*, 520 at 962; *compare*

> Value ("[L]iquidation value. 1. The value of a business or of an asset when it is sold in liquidation, as opposed to being sold in the ordinary course of business.")

Black's Law Dictionary (11th ed. 2019) (1908), *with*

> Cost, ("[R]eplacement cost. The cost of a substitute asset that is equivalent to an asset currently held. The new

7

> asset has the same utility but may or may not be identical
> to the one replaced."

*Id.* (1938).

Appellees do not even argue otherwise.  Appellees argue that NOLV "account[s] for both the high-end and low-end potential outcomes as of the Petition Date—namely, going-concern sale under the shadow of liquidation, or, alternatively, pivoting to forced liquidation, Appellees Brief at 42, and that "foreclosure value is what a *creditor* would obtain," whereas NOLV is what a *debtor* would obtain by selling the collateral.  *Id.* 47.  These distinctions, even if accurate, are irrelevant.  The *Rash* valuation standard is "what the debtor would have to pay for comparable property."  *Rash* 520 U.S. at 955.  "Whatever the attractiveness of a standard that picks the midpoint between foreclosure and replacement values, there is no warrant for it in the Code."  *Rash*, 520 U.S. at 964.

*Fourth*, Appellees attempt to defend the bankruptcy court's reliance on sources explicitly rejected by *Rash* as merely citations to "general principles." Appellees Brief at 47.  Appellees fail to explain how, in light of the Supreme Court's decision to "give no weight to the legislative history of § 506(a)," noting it is "unedifying" and "not enlightening," *Rash*, 520 U.S. at 963 n. 4, this legislative history could nonetheless be persuasive or even informative.  Moreover, *Rash* explicitly rejected the "ruleless approach" of other courts, *In re Valenti*, 105 F.3d 55, 62 (2d Cir. 1997), which "allow[ed] use of different valuation standards based

8

on the facts and circumstances of individual cases." 520 U.S. at 964 n.5.  The *Rash* court set down an absolute rule of law and the bankruptcy court cannot rely upon authorities explicitly rejected in that decision in order to avoid that rule.

Appellees nevertheless argue that footnote six of *Rash* "left to bankruptcy courts, 'as triers of fact, identification of the best way of ascertaining replacement value on the basis of the evidence presented." Appellees Brief at 47.  Appellees further argue, pursuant to footnote six, "that replacement value could be 'retail value, wholesale value or some other value' depending on the type of Debtor and property at issue." *Id.* at 47-48 (quoting *Rash*, 520 U.S. at 965 n.6).  Footnote six, however, refers to the way in which the debtor could purchase the collateral, not the way in which it would sell it.  Thus, Mr. Rash's truck would be valued at the retail cost to him to purchase a similar vehicle, while the Debtors' inventory here would be valued at the wholesale cost to the Debtors to purchase replacement inventory.  *In re UAL Corp.*, 351 B.R. 916, 921 (Bankr. N.D. Ill. 2006) (under *Rash*, court considers "the debtor's position in the marketplace," since "[a]n ordinary consumer . . . might not have access to the wholesale market for [the collateral], but a debtor in the business of selling [the collateral] would."); *see Rash*, 520 U.S. at 965 n.2 ("by replacement value, we mean the price a willing buyer in the debtor's trade, business, or situation would pay a willing seller to obtain property of like age and condition").

9

The Ninth Circuit *en banc* considered and rejected Appellees' exact argument in *In re Sunnyslope Hous. Ltd. P'ship*, 859 F.3d 637, 645 n.3 (9th Cir. 2017), *as amended* (June 23, 2017), *cert. denied*, 138 S. Ct. 648 (2018), an authority that Appellees tellingly ignore.  *See* Second-Lien Brief at 52 (discussing *Sunnyslope*).  *Sunnyslope* involved the valuation of an apartment complex that the chapter 11 debtor retained for continued use as affordable housing.  Because the affordable housing restrictions could be avoided in a foreclosure, the property's foreclosure value was *greater* than its replacement, or market, value.  *Id.* at 644-45. The *en banc* court rejected the panel's holding that foreclosure value could be appropriate given the discretion left to the bankruptcy court in footnote six of *Rash*, noting that the Supreme Court in *Rash* explicitly rejected the "foreclosure value standard" as a method of determining replacement value.  *Id.* at 645 n.3 (quoting 520 U.S. at 965 n.6).  The *Sunnyslope* court went on to explain that *Rash* mandated replacement value where the debtor proposed to continue to use the property, and it could not "depart from that standard without doing precisely what *Rash* instructed bankruptcy courts to avoid—assuming a foreclosure that the Chapter 11 petition prevented."  *Id.* at 645.  The same is true here—had the bankruptcy court properly applied a replacement value standard, it would have had discretion to choose among, for example, wholesale, retail, or book value, as analyzed by Schulte.  But the bankruptcy court had no discretion to choose NOLV

10

or foreclosure value, which are simply not methods of determining replacement cost, which is fair-market value: "the price a willing buyer in the debtor's trade, business, or situation would pay to obtain like property from a willing seller." *Rash*, 520 U.S. at 960.

*Finally*, Appellees try to cast the bankruptcy court's valuation analysis as a pure factual finding subject only to clear error review. *See*, *e.g.*, Appellees Brief at 35-39. *Rash* precludes that argument as well. The Supreme Court did *not* conduct a clear error review of the Fifth Circuit's choice of foreclosure methodology to value the collateral in *Rash*. Like here, the *Rash* appeal arose from an "evidentiary hearing" held by the bankruptcy court "to resolve the dispute over the [collateral's] value," *id.* at 957, but the Supreme Court gave no deference to the bankruptcy court's choice of methodology, *see id.* at 961-62. The choice of valuation methodology is a legal determination subject to *de novo* review. *See*, *e.g.*, *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 445 (1968) ("Evaluations of evidence reached by the accurate application of erroneous legal standards are erroneous evaluations."); *Matter of King Res. Co.*, 651 F.2d 1326, 1335 (10th Cir. 1980) ("[I]f our examination of the record reveals that the district court did not use the proper method of valuation, such valuation cannot stand even though it could not be described as clearly erroneous."); *Nat'l Rural Utilities Co-op. Fin. Corp. v. Wabash Valley Power*

11

*Ass'n, Inc.*, 111 B.R. 752, 767 (S.D. Ind. 1990) ("[T]he selection and application of the valuation standard must be reviewed *de novo.*"); *In re Westpointe, L.P.*, 234 B.R. 431, 437 (E.D. Mo. 1999) ("Whether the method of valuation used was correct, however, is a legal question."), *aff'd,* 241 F.3d 1005 (8th Cir. 2001).[2]

### B.      The Bankruptcy Court's Decision Was Infected By its Legally Erroneous Choice of Valuation Methodology

The bankruptcy court assumed that the "reality" of the case was a hypothetical liquidation that was not the Debtors' plan on the Petition Date and that never took place and then applied the wrong legal standard to that counter-factual hypothetical.  All of the factual findings underlying its valuation analysis are infected by its incorrect legal determination that the Second-Lien Collateral should be valued at what the Debtors would have obtained in a hypothetical liquidation, rather than based on the cost to the Debtors to acquire the collateral.

*First*, while Appellees attempt to cast the bankruptcy court's rejections of Schulte's (and by extension, Henrich's) expert testimony as credibility determinations, Appellees Brief at 32, the bankruptcy court's quarrels with Schulte's and Henrich's methodology were based the court's disagreement as to

---

[2] Appellees rely on *Sunnyslope*, 859 F.3d at 644, to argue that the valuation determination should be reviewed only for clear error.  *See* Appellees Brief at 24. But *Sunnyslope* merely stands for the proposition that, once the bankruptcy court chooses the *correct* valuation methodology, its factual findings in connection with applying that methodology are reviewed for clear error.  At issue here is the threshold *legal* determination of what methodology to apply.

the proper *legal* test.  Both Schulte and Henrich applied the replacement cost

standard mandated by *Rash*.  *See* Second-Lien Brief at 19-23.  The bankruptcy

court stated that its rejection of Schulte's report "really wasn't particularly Mr.

Schulte's fault, but based on the direction he was given, which I believe is based

on a misguided interpretation of the effect of the *Rash* case as applied to

determining initial adequate protection value."  A-4791 (231:11-15).  The court

further stated that it believed the appropriate legal standard was "contrary to the

legal approach applied by Mr. Schulte, apparently at the direction of Counsel."  *Id.*

(231:18-19).

Under the appropriate valuation methodology, there was more than ample

evidence in the record to support Schulte's and Henrich's valuations.  In their first-

day filings, the Debtors announced plans to pursue a going-concern sale of

approximately 400 "four-wall EBITDA positive" stores, and conduct GOB sales at

142 stores.  A-8-9.  Schulte and Henrich valued the inventory collateral according

to what actually happened, which was largely consistent with that Petition Date

announcement.  The inventory sold in the Go-Forward stores was used by the

Debtors to generate economic value, just as in *Rash*.  Accordingly, Schulte valued

the inventory at the Go-Forward stores at book value, which he testified without

contradiction "roughly approximate[d its] replacement value."  A-2890 (Schulte

Report); Second-Lien Brief at 54.  The book value of this inventory was also

13

consistent with the results achieved by the Debtors in pre-bankruptcy inventory sales.  A-2889.  Henrich likewise properly applied *Rash* by valuing the inventory at Go-Forward stores at retail value net of direct selling costs and overhead.  A-3080 (Henrich Declaration).

Schulte and Henrich valued the inventory collateral at the GOB stores based on the historical and actual realizable recoveries for such types of sales, which Appellees did not dispute.  Schulte calculated net retail value, which is the actual value achieved after deducting store-level costs.  *See* A-2891 (Schulte Report). Similarly, Henrich valued the inventory at GOB stores based on the actual results of those liquidation sales.  *See* Second-Lien Brief at 54-55.

Ultimately, the sale of inventory and collection of receivables during the bankruptcy cases generated over $3.3 billion in revenues for the Debtors, A-2363; A-3504; A-3500, which the Debtors used to pay down debt, fund the significant operating expenses of the cases, and purchase approximately $1.1 billion in new inventory, A-3504; A-3500.  "Where, as here, an asset is sold in an arm's-length transaction, the fair market value of such asset is conclusively determined by the price paid."  *Residential Capital,* 501 B.R. at 603 (Bankr. S.D.N.Y. 2013); *see also Urban Communicators PCS Ltd. P'ship v. Gabriel Capital, L.P.*, 394 B.R. 325, 336 (S.D.N.Y. 2008) ("[W]here collateral was actually sold during the pendency of the case (and where the terms of the sale were fair and arrived at on an arm's-length

14

basis), the actual sale price should be used to measure the property's value, as contrasted to some 'earlier hypothetical valuation.'") (collecting cases); 4 Collier on Bankruptcy ¶ 506.03[6][b] (rev. 15th ed. 2008) ("[I]f an actual sale . . . is to occur, the value of the collateral should be based on the consideration to be received by the estate in connection with the sale, provided that the terms of the sale are fair and were arrived at on an arm's-length basis."). That is precisely what Schulte and Henrich did here. "[V]aluation" must be "based in reality." *In re Coated Sales, Inc.*, 144 B.R. 663, 668 (Bankr. S.D.N.Y. 1992) *cited with approval* in *In re Iridium Operating LLC*, 373 B.R. 283, 345 (Bankr. S.D.N.Y. 2007).

Appellees never disputed any of the evidence of book value or of the actual value achieved in retail inventory sales, which came from the Debtors' books and records, and on which experts are entitled to rely in forming their opinions. Fed. R. Evid. 703; *U.S. v. Liew*, 2014 WL 554491, at *2 (N.D. Cal. Feb. 7, 2014). Instead, they argued that the inventory delivered as part of the going concern sale to Transform was sold at 85% of book value and that price should be considered the fair market value of the inventory not only as of the Sale Transaction, but also as of the Petition Date. *See* Second-Lien Brief at 29. The bankruptcy court properly rejected that argument, as the APA did not allocate any portion of the $5.2 billion in value delivered to the Debtors in connection with the Sale Transaction to inventory. *See* Second-Lien Brief at 32-33; A-4794-95 (234:17-

15

235:22).  Notably, Appellees themselves never contended below that liquidation value should govern.  To the contrary, the Debtors conceded that an NOLV valuation was "not appropriate under circumstances when, as here, the Debtors contemplated a going concern sale as of the Petition Date."  A-1810; *see also* Second-Lien Brief at 29.

The bankruptcy court's improper legal and counterfactual valuation approach erased *hundreds of millions of dollars* in value that the Debtors actually achieved in the sales of inventory—proceeds that are indisputably Second-Lien Collateral but that were never returned to the Second-Lien Holders.  The court instead improperly "valu[ed] a liquidation transaction that was never planned and never took place."  *Motors Liquidation Co.*, 576 B.R. at 445 (rejecting "the use of liquidation value for the assets that were sold . . . as part of a going concern."). This resulted in exactly what Section 506(a) is designed to prevent, permitting the Debtors to "reap a windfall by stripping down the lien to liquidation value and quickly selling the collateral at fair market value, thus pocketing equity that would have been completely beyond reach save for the filing of the bankruptcy petition." *Winthrop*, 50 F.3d at 76.  To the extent the Collateral here was inventory sold at retail, rather than a capital good, Henrich's retail valuation approach properly captures the incremental value between the Debtors' replacement cost and the selling price of the inventory, both to avoid such an improper windfall to the

16

Debtors and to properly capture the full value of the collateral for the Second-Lien Holders.

The bankruptcy court's *partial* reliance on Murray's minimum case scenario—valuing inventory at a blended average of 77% in comparison to Murray's minimum case valuation of 88.7% of book value—also cannot be reconciled with *Rash*. Murray took a unique approach to valuation based on a freeze-frame view of the world at the Petition Date. This was a view that Murray herself acknowledged provided only a minimum baseline value, and she set forth various alternative indications of value that were higher than the minimum case. *See* Second-Lien Brief at 25-28; *see also* A-1991-1992; A-1996. Although Murray's approach undervalued the actual realized value of collateral, it also allowed for other adjustments such as eliminating certain liabilities, including the material L/C contingent liabilities that had not materialized at that point. The bankruptcy court cherry-picked a part of this analysis by applying the NOLV valuation but then refused to apply these countervailing factors. *See* Second-Lien Brief at 55-60. Regardless of the merits of Murray's approach, it at least had the integrity of being internally consistent. The bankruptcy court could not rely on part of this analysis without accepting the whole package.

17

## II.   APPELLEES BRIEF CONFIRMS THAT THE BANKRUPTCY COURT'S OTHER "ADJUSTMENTS" WERE IMPROPER.

### A.   Appellees Failed To Meet Their Burden To Establish That The Stand-By Letters Of Credit Would Be Drawn

The bankruptcy court erred in deducting the full value of the Debtors' L/C Facilities, despite the fact that the L/C Facilities (i) were not drawn on the Petition Date, (ii) were only drawn at $9 million during the case, (iii) were rolled over to Transform in the going-concern sale, and (iv) never gave rise to claims against the Debtors beyond the $9 million drawn.

The bankruptcy court's decision to deduct the full value of the Debtors' L/C Facilities, totaling approximately $395 million, from the Second-Lien Collateral value, is similarly infected by its incorrect determination that the collateral should be valued assuming a counter-factual hypothetical liquidation that was not the plan on the Petition Date and never took place, and constitutes legal error.  Appellees argue that if an orderly liquidation had occurred, "the letters of credit would [have] be[en] drawn down," Appellees Brief at 49, and therefore, because the Second-Lien Holders "failed to provide a valuation of the letters of credit based on" the purported potential for liquidation, *id.*, the bankruptcy court properly deducted the full principal amount of the L/C Facilities from the value of the Second-Lien Collateral.  *Id.*  This is incorrect.

18

The Debtors concede, as did the bankruptcy court, that the standby letters of credit were contingent obligations. Appellees Brief at 23, 26. *See FDIC v. Philadelphia Gear Corp.*, 476 U.S. 426, 428 (1986); *Kayvsville City v. FDIC*, 557 F. App'x 719, 723 (10th Cir. 2014) ("a standby letter of credit is merely a contingent liability"). Consequently, they "require[d] a triggering event to occur before the debtor corporation has a legal duty to pay the creditor." C. Ryan Stewart, *Contingent Liabilities and Disputed Claims in the Context of a Bankruptcy Solvency Analysis*, Bankruptcy Valuation and Solvency Insights, at 55 (Winter 2014). "[A] contingent liability is not certain – and often is highly unlikely – ever to become an actual liability. *In re Xonics Photochemical, Inc.*, 841 F.2d 198, 200 (7th Cir. 1988). Even Appellees concede that it was only a "reasonable possibility" that there would be a liquidation. Appellees Brief at 49. "To value the contingent liability it is necessary to discount it by the probability that the contingency will occur and the liability become real." *Xonics*, 841 F.2d at 200.

The Debtors' L/C facilities were a form of self-insurance for workers' compensation, utility payments, and certain real estate expenses, to "guarantee" that payments on those obligations would be made. A-3000-04. The Debtors paid their workers' compensation, utilities, and real estate obligations directly in the

19

ordinary course of business.  The stand-by letters of credit would only be drawn if the Debtors failed to make those required payments.  *Id.*

It is undisputed that the status quo as of the Petition Date was that the Debtors were operating as a going concern, and intended to continue to do so. *E.g.*, A-249-250, A-395-396 (Interim DIP order referring to continued operations and "Go Forward Plan"); Appellees Brief at 9, 10, 42.  Although the Debtors' claim to have "contemplated," some months after the Petition Date, a "pivot" to liquidation means they were operating as a going concern at the Petition Date and thereafter, even while "contemplating" the "pivot" which never occurred.[3]

The Second-Lien Holders submitted unrebutted expert testimony that the L/C Facilities would not be drawn while the Debtors were operating as a going concern because the Debtors would continue to pay their obligations.  A-2891-2892 (Schulte); A-1980, A-2976-2977 (Murray); A-3084 (Henrich).  That testimony was supported by the sworn declaration of the Debtors' chief financial officer, which stated that the collateral for the First-Lien Debt "was valued at approximately $2.8 billion . . . with approximately $1.53 billion borrowed against it under the" First-Lien Debt, an amount that did not include the L/C Facilities.

---

[3] To support the possibility of a "pivot," Appellees include in their Appendix a declaration of William L. Transier which was not included in the record below and refers to contemplation of a "pivot" in January 2019, not at the Petition Date in October 2018.  A-4886-88.

A-407-408 (Riecker).  Moreover, the expert testimony was confirmed by the undisputed reality that the Debtors operated as a going concern on and after the Petition Date; that no liquidation ever occurred, except in certain GOB stores; and that only $9 million, or less than 2.3% of the total principal amount of the outstanding L/C Facilities, was drawn after the Petition Date.  *See* Second-Lien Brief at 37-40; A-2948.  ESL and Cyrus also had every incentive to extend the expiring L/C Facilities, and in fact did extend them during the bankruptcy.  *See* Second-Lien Brief at 39.

Importantly, the party seeking to assert that a contingent liability should be treated as an actual liability "must show that its contingency was likely to occur, such that the liability was likely to become fixed."  *In re Goldstein*, 194 B.R. 1, 2 (Bankr. D. Mass. 1996).  Thus, once the Second-Lien Holders established, through their experts, that the L/C Facilities would not be drawn upon during the bankruptcy case, it became incumbent upon Appellees, as the party seeking to assert that the contingent liability of the L/C Facilities should be treated, as of the Petition Date, as an actual liability, to establish the likelihood, as of the Petition Date, that the Debtors would liquidate and that, as a result, the contingency under the L/C Facilities might be triggered and the L/C Facilities might be drawn.  *Goldstein*, 194 B.R. at 2.

To establish that the value of the Second-Lien Collateral should be reduced by the full principal amount of the L/C Facilities, Appellees were required to establish that there was a 100% probability of liquidation at the Petition Date, and 100% probability that the L/C Facilities would be drawn, and 100% probability that no cash would be returned after the draw.  *See Xonics*, 841 F.2d at 200-01. Appellees submitted no evidence below regarding the probability of liquidation as of the Petition Date, let alone that that probability was 100%, however, and point to none on appeal.  Nor could they, because the Debtors were not liquidating, or planning to liquidate, at the Petition Date.

Not only is it undisputed that no liquidation actually occurred, but to the extent the chances of a liquidation increased over time after the Petition Date as the Debtors allegedly "contemplated" their so-called "pivot" to a liquidation, the increasing probability of their contingent liability under the L/C Facilities becoming an actual liability arguably caused the Second-Lien Collateral to diminish in value, as the contingent liability under the L/C Facilities allegedly blossomed into an actual liability.  This constitutes a diminution in the value of the Second-Lien Collateral for which the Second-Lien Holders were entitled to a super-priority claim; it was not cause for a reduction in the value of the Second-Lien Collateral as of the Petition Date.

The only "evidence" Appellees cite on appeal to support their assertion that the contingent obligation of the L/C Facilities should be treated as an actual obligation is a statement by the Debtors' fact witness, Griffith, "that letters of credit are 'almost always fully drawn' in a liquidation." Appellees Brief at 50 (quoting A-2125). That testimony is irrelevant, however, because it does not establish any probability as of the Petition Date that a liquidation would occur. Moreover, that testimony was inadmissible because, as the Debtors admit, Griffith "set forth the basis for this knowledge as being from another bankruptcy [in which Griffith did not participate, A-4426] and discussions with colleagues." In other words, Griffith's testimony was rank hearsay. Appellees Brief at 50 n.14 (citing A-4426); *see also* Second-Lien Brief at 63; Fed. R. Evid. 602, 801. In any event, a draw on a stand-by letter of credit does not transmute the contingent nature of the obligation; if no claim is made with respect to the underlying obligation, drawn amounts will be returned to the debtor.

Appellees also point to a statement by the bankruptcy court in which the court, *sua sponte*, stated that it "can take judicial notice" of the fact that letters of credit had been drawn "in the A&P case." Appellees Brief at 50; A-4638 (78:17-20). While that may have been so in one other case, that does not give the bankruptcy court license to draw conclusions about what would happen in this case, particularly with respect to the likelihood that the Debtors would liquidate.

23

Moreover, the bankruptcy court's statement indicated that the draws in the A&P case were inappropriate because "they're trying to get back some money."  A-4638 (78:19-20).

Federal Rule of Evidence 201 does not permit courts to take judicial notice of facts in another case and then apply those facts to the case at hand.  The Second Circuit has held that "[b]ecause the effect of judicial notice is to deprive a party of the opportunity to use rebuttal evidence, cross-examination, and argument to attack contrary evidence, caution must be used in determining that a fact is beyond controversy under [Federal] Rule [of Evidence] 201(b)," and that "[f]acts adjudicated in a prior case" are not "beyond controversy" for purposes of Fed. R. Evid. 201.  *Int'l Star Class Yacht Ass'n v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 70-71 (2d Cir. 1998); *see also M/V American Queen v. San Diego Marine Constr. Corp.*, 708 F.2d 1483, 1491 (9th Cir. 1983) ("As a general rule, a court may not take judicial notice of proceedings or records in another cause so as to supply, without formal introduction of evidence, facts essential to support a contention in a cause then before it").  Moreover, the bankruptcy court's vague statement about the A&P case is insufficient to allow this Court to even review the propriety of the bankruptcy court's holding.  *In re Mazzeo*, 167 F.3d 139, 142-43 (2d Cir. 1999).

In *Xonics*, the Seventh Circuit cautioned against leaving the "unsettling impression that contingent liabilities must . . . be treated as definite liabilities even though the contingency has not occurred." *Xonics*, 841 F.2d at 201. Here, the bankruptcy court did more than just leave the "unsettling impression." It expressly held that the Debtors' contingent liabilities were 100% definite as of the Petition Date, despite the fact that the contingency had not occurred as of the Petition Date, the Second-Lien Holders' experts provided unrebutted testimony that the contingency would not occur, there was no admissible evidence to establish that the contingency would occur, and it is beyond dispute that the contingency never occurred. The bankruptcy court's decision was legal error and must be reversed.

### B.   Post-Petition Interest Should Not Be Deducted From The Second-Lien Collateral Value At The Petition Date

The bankruptcy court erred in deducting from the value of the Second-Lien Collateral as of the Petition Date an amount of interest "projected" to be incurred on account of the First-Lien Debt *after* the Petition Date during the course of the Debtors' non-existent liquidation. In so doing, the bankruptcy court not only undervalued the Second-Lien Collateral, it improperly denied the Second-Lien Holders adequate protection against the post-petition diminution of the Second-Lien Collateral value.

Appellees argue, without citation to legal authority, that the bankruptcy court was entitled to reduce the Second-Lien Collateral value by "projected" post-

petition interest to be accrued on the First-Lien Debt because there was a "reasonable possibility" as of the Petition Date that post-petition interest would be paid during the course of an imagined, post-petition orderly liquidation. *See* Appellees Brief at 51-52.

Once a bankruptcy petition is filed, the automatic stay prevents a creditor from foreclosing on its collateral.  11 U.S.C. § 362(a); *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 369 (1988); *LNC Invs., Inc. v. First Fid. Bank, N.A.*, 247 B.R. 38, 44-45 (S.D.N.Y. 2000).  The Bankruptcy Code therefore embraces "[t]he concept of adequate protection[, which] is derived from the fifth amendment protection of property interest," to protect secured creditors against losses that occur when creditors are unable to exercise their property rights due to the automatic stay.  *LNC Invs.*, 247 B.R. at 44 (citing *Wright v. Union Central Life Ins. Co.*, 311 U.S. 273 (1940)).

Junior secured creditors are entitled to adequate protection from diminution in value of their collateral caused by post-petition interest payments to holders of senior liens on the same collateral.  The purpose of adequate protection is to "afford[] protection to a secured creditor for any decrease in the value of that creditor's interest in the collateral as it existed at the time of the filing," including where the creditor's "position had been eaten away by . . . post-petition interest accrued to the senior lienholders."  *In re Polries Bros.*, 49 B.R. 669, 674-75

26

(D.N.D. 1985); *see also Ridgemont Apartment Associates, Ltd. v. Atlanta English Village, Ltd.*, 110 B.R. 77 (N.D. Ga. 1989), *aff'd*, 890 F.2d 1166 (11th Cir. 1989) (adequate protection payments to junior creditor in the amount of post-petition interest accruing to senior creditors is appropriate because that accrual "erodes the property interest available to junior creditors" such that the junior creditor's "interest in the property is diminished each month to the extent of the interest accrued against the property on the [first lien] indebtedness"); *In re Langley*, 30 B.R. 595, 603 (Bankr. N.D. Ind. 1983) ("adequate protection would include the amount of accruing postpetition interest on [the senior secured creditor's] obligation.  This accrual is clearly diminishing the value of the collateral from the date the petition was filed, with the effect that less collateral will be able to be available to satisfy [the junior creditor's] claim").

Here, it is undisputed that the Second-Lien Holders received replacement liens and Section 507(b) claims at the outset of the bankruptcy case as adequate protection in the event of any diminution in the value of the Second-Lien Collateral.  Appellees Brief at 9; Second-Lien Brief at 14-15; A-460-465.  The bankruptcy court's decision, however, eviscerates that adequate protection.  Under Appellees' and the bankruptcy court's theory, a court can "buil[d] into the starting valuation of the collateral on the Petition Date" post-petition interest, and, presumably, any other post-petition expenses that are a "reasonable possibility" on

27

the Petition Date.  *See* Appellees Brief at 52.  This denies the secured creditor

protection against the diminution in value of its collateral during the course of the

bankruptcy case because these expenses are precisely what adequate protection is

designed to protect against.  Such a reduction, based on future costs expected to be

incurred *after* adequate protection is granted, violates the Supreme Court's

decision in *Rash*, which requires that the collateral be valued at its replacement

cost and does not permit a reduction in that value based on expenses to be incurred

in the future with respect to the collateral.

   *In re Rupprect*, 161 B.R. 48 (Bankr D. Neb. 1993), is directly on point.  It

holds that junior creditors are entitled to be adequately protected from post-petition

reductions in collateral value caused by interest payments to senior creditors.

*Rupprect*, 161 B.R. at 49.  Appellees' effort to distinguish it on the ground that

there "the creditor specifically sought (and received) adequate protection to protect

against the post-petition interest," Appellees Brief at 52, fails.

   Here, the Final DIP Order specifically mentions diminution in value caused

by "the priming of the Prepetition Second Lien Facility Liens," which includes

interest on the First-Lien Loan which primed the Second-Lien Obligations.  A-460.

There is no requirement that an order granting adequate protection list every single

way in which a creditor's collateral might be diminished.  Adequate protection of

the kind provided to the Second-Lien Holders here guards against *any* "decrease in

28

the value of" the creditor's interest in the collateral as a result of the automatic stay. 11 U.S.C. § 361(2); A-460-462.

## C. Credit Card Receivables

The bankruptcy court likewise erred in adopting Appellees' position that the credit card receivables should be valued at only 85% of the Borrowing Base amount. *See* Second-Lien Brief at 53; A-4798 (238:1-12). The bankruptcy court provided no explanation for using the 85% number, other than its unwarranted dismissal of the Second-Lien Holders' valuations. *See* A-4798 (238:1-12).

Expert testimony supports the Second-Lien Holders' valuations, and the Debtors failed to provide any expert testimony to rebut those valuations. *See* A-2887 (Schulte Report); A-3076 (Henrich Declaration). The experts' valuations were based on the Debtors' own ledger, and the near certainty of collection of 100% of these receivables is reflected in the fact that the Debtors' outside public accountants allowed these assets to be reported in Sears' SEC financials as cash. *See* A-3659 (Form 10-K).

Appellees argue that the bankruptcy court was entitled to "default to" their lower valuation. Appellees Brief at 53. But they provide no explanation or legal authority to support their valuation, or the possibility that even a liquidation would reduce the value of credit card receivables at all. *Id.* They state only that 85% of the Borrowing Base is better than nothing, ignoring the fact that the bankruptcy

court previously rejected the 85% discount that the Debtors argued for across the board as lacking any evidentiary basis, and yet arbitrarily applied it to credit card receivables and no other category of collateral.  *See* A-4795 ("There is a problem with this evidence . . . in that there's no binding agreement to show that the parties intended that 85 percent discounted number to be the allocable value for the collateral.").

### D.    Pharmacy Scripts

In arguing that the bankruptcy court did not err in declining to count pharmacy scripts as Second-Lien Collateral, Appellees mischaracterize the court's discussion of those scripts and make extraneous arguments about other agreements that have no bearing on the plain meaning of the Second-Lien Security Agreement.

*First*, Appellees assert that the bankruptcy court "never found that the pharmacy scripts were 'books and records' under the 2L Security Agreement."  *See* Appellees Brief at 58 n. 18.  The hearing transcript shows otherwise.  After observing that the Second-Lien Holders argued that the scripts were either inventory or books and records, the bankruptcy court stated:

> The right to fill a prescription, to my mind, clearly is not inventory.  The lien on 'books and records' as set forth in the 2L security agreement, has a qualifying clause which states that they are books and records pertaining to the collateral.  I do not believe that a right to sell un-presented prescriptions is in fact such an item of collateral.

A-4800 (240:17-23).

30

Had the bankruptcy court concluded that the scripts were not books and records, it would have simply said so, just as it plainly stated its conclusion that the scripts were not inventory. Instead, the bankruptcy court looked to whether the scripts were books and records *pertaining to the collateral*, making clear that it accepted as a threshold matter that the scripts were in fact books and records.

The bankruptcy court's legal conclusion that the scripts do not pertain to the collateral simply makes no sense. Appellees do not dispute that pharmacy scripts are prescriptions written by doctors and presented to Sears by customers with pending rights to refill. Thus, by their very nature, the scripts pertain to the pharmacy inventory and receivables (including the very medication that would be issued to customers based on the scripts), which are at the heart of the pharmacy collateral the Debtors pledged under the Second-Lien Security Agreement. *See* A-3431 (Second Lien Security Agreement § 2.1(f)).

*Second*, Appellees point to provisions in the APA, Sale Order, and First-Lien Security Agreement expressly including scripts as collateral, and assert that, based on these provisions, this Court should conclude that parties to the Second-Lien Security Agreement "intended to exclude pharmacy scripts from the 2L Collateral." Appellees Brief at 58-59. Appellees cite *Nationwide Emerging Managers, LLC v. NorthPointe Holdings, LLC*, 112 A.3d 878, 898 (Del. 2015), for the proposition that the language of these other agreements "cuts against reading

31

pharmacy scripts into the collateral" under the Second-Lien Security Agreement, Appellees Brief at 59, but that case discussed looking at other agreements to determine only the intentions of the parties with respect to an implied covenant claim, not with respect to the interpretation of unambiguous contractual terms. Indeed, Appellees' own cited case reiterates that "[t]he plain, common, or normal meaning of language will be given to the words of a contract unless the circumstances show that in a particular case a special meaning should be attached to them." *Nationwide Emerging Managers*, 112 A.3d at 895 n.65. The plain language of the Second-Lien Security Agreement here indicates that the scripts amount to books and records pertaining to pharmacy inventory. The bankruptcy court plainly erred in reading the contract otherwise.

Appellees also argue that the bankruptcy court did not err in discounting the scripts to 38.1% of the value assigned to those scripts by the Debtors' own records as of the Petition Date. Here again, Appellees' argument fails. What Appellees call the "NOLV reality," Appellees Brief at 61, is a fiction; there was no liquidation of the scripts or any other collateral, and *Rash* therefore requires valuation based on replacement value, not NOLV. *See supra* 2-12.

## E. The Bankruptcy Court's Deduction Of Overhead Costs From The Second-Lien Collateral Value Cannot Be Justified And Was Error

Appellees argue that the bankruptcy court appropriately assessed a 1.3% surcharge against the Second-Lien Collateral pursuant to Bankruptcy Code Section

506(c) because "the value of the inventory could not be realized without expending costs," and thus the bankruptcy court was allowed to deduct those costs. Appellees Brief at 53-55. Appellees' arguments that 1.3% represented the costs attributable to hypothetically liquidating the collateral, and that Wilmington Trust's expert, Henrich, acknowledged that deducting costs was appropriate under some circumstances, Appellees Brief at 53-55, both fail.

As an initial matter, Appellees, who successfully sought to stay their separate appeal from the bankruptcy court's decision denying their motion to surcharge the Second-Lien Holders' Collateral pursuant to Bankruptcy Code Section 506(c),[4] should not now be permitted to assert in this appeal arguments regarding the imposition of Section 506(c) costs. *Cf. Broadcom Corp. v. Qualcomm Inc.*, 2005 WL 5925584, at *5 (C.D. Cal. Oct. 19, 2005) ("Having successfully urged the Court to stay the litigation . . . in this case in favor of [another] proceeding, Qualcomm cannot turn back now").

In any event, even if an NOLV approach to valuation were appropriate, Appellees nowhere explain why 1.3% reflects the costs attributable to the hypothetical liquidation of collateral, especially since the bankruptcy court's application of *net* orderly liquidation value already takes account of those costs. *In re RadioShack Corp.*, 2015 Bankr. LEXIS 4541, at *561 (Bankr. D. Del. Mar. 12,

---

[4] *See* Dkt. No. 25 in Case No. 19-cv-8002-VB.

33

2015) (approving agreement defining NOLV as being "*net of all liquidation expenses*" (emphasis added)); A-3010 (Murray) (NOLV refers to liquidation value "*after the deduction of expenses*" (emphasis added)).

Appellees concede that Henrich never referred to 1.3% as being an appropriate measure of costs.  Appellees Brief at 54-55.  Appellees also ignore the fact that Henrich's valuation reflected the costs of operating a going concern business that continued to sell inventory at retail, <u>not</u> the costs associated with a hypothetical orderly liquidation.  A-3080-3081.  Henrich's cost assumptions cannot be cherry picked from a retail analysis and applied to an NOLV analysis.

Incredibly, Appellees also argue, without any support, that the bankruptcy court's 1.3% resulted from the bankruptcy court inadvertently transposing 1.3% and 3.1%.  Appellees Brief at 55.  Appellees' speculative justification is an admission that there is no support in the record for the bankruptcy court's cost deduction, as they can only justify the bankruptcy court's figure by assuming a typographical error.  Appellees' argument confirms that the bankruptcy court's decision was clear legal error and manifestly incorrect and must be reversed.

### F.  Ineligible Inventory

The bankruptcy court erred in *sua sponte* declining to attribute any value to inventory marked as "ineligible" in the First-Lien Lenders' Borrowing Base.  *See* Second-Lien Brief at 69; A-4797-98 (237:8-238:13).

At trial, the parties *agreed* that ineligible inventory had substantial value, and the Debtors themselves proposed valuing both eligible inventory and ineligible inventory at 85% of book value. *See* Second-Lien Brief at 69 and n.17; Appellees Brief at 56. Now, Appellees argue in their opposition that the bankruptcy court did not err by attributing zero value to ineligible inventory. Appellees Brief at 56.[5] There is no justification, however, for reducing the Second-Lien Collateral by roughly $300 million in "ineligible" inventory—including in-transit inventory, much of which was actually delivered and sold—simply because the First-Lien Lenders chose to exclude it from their Borrowing Base. The Second-Lien Holders' experts provided unrebutted testimony regarding the value of the ineligible inventory,[6] and the Debtors acknowledged the sale of all the collateral, which

---

[5] Appellees' arguments concerning the cases cited in the Second-Lien Brief do not hold water. In *In re Lyondell Chem. Co.*, the district court reversed a lower court's valuation that was not suggested by either party. 585 B.R. 41, 59 (S.D.N.Y. 2018). The same is true here. Both the Second-Lien Holders and Appellees put forth evidence that the ineligible inventory had substantial value, yet the bankruptcy court ascribed no value and should be reversed. *See also In re Aerogroup International*, 601 B.R. 571 (Bankr. D. Del. 2019) (the court did not simply attribute no value to the collateral, but instead reached its own conclusion as to fair market value that was supported by the record and within the range of the values asserted by the parties' experts); *In re M.D. Moody & Sons, Inc.*, 2010 Bankr. LEXIS 5220 (Bankr. M.D. Fla. Mar. 5, 2010) (finding it difficult to ascertain the fair market value of ineligible receivables, yet still ascribing a value that fell between that listed in the borrowing certificate as of the petition date and the remaining balance).

[6] Appellees incorrectly state that "there was no expert valuation or competent evidence of the ineligible inventory beyond the book value," Appellees Brief at 56,

necessarily included the ineligible inventory, for value.  *See* A-1838 (Griffith

Declaration, Ex. A); *see also* A-1634 (APA § 10.9).

### G.    Cash

As explained in the Second-Lien Brief, the bankruptcy court erred as a

matter of law in failing to count as Second-Lien Collateral the cash the Debtors

held on the Petition Date.  In response, Appellees reprise their failed argument that

the terms of the First-Lien Security Agreement somehow indicate that this item of

collateral (like the scripts) purportedly was excluded from the Second-Lien

Security Agreement.  *See* Appellees Brief at 61.  Here again, Appellees cannot

sidestep the plain language of the Second-Lien Security Agreement, which

unambiguously includes "proceeds" of collateral—i.e, the cash generated from the

sale of that collateral.  The terms of an entirely separate contract have nothing to

do with how collateral is defined in the Second-Lien Security Agreement.

Appellees next argue that the Second-Lien Holders failed to trace the cash to

show it is proceeds of collateral, and that the Second-Lien Holders are attempting

to "foist the burden onto the Debtors."  Appellees Brief at 62.  But Appellees do

not and cannot point to any evidence showing that the cash was anything other

than proceeds of the Second-Lien Collateral.  Indeed, they do not even attempt to

---

but acknowledge calculations provided by Ms. Murray of the value of in-transit
inventory.  *Id.* at 58 n.17.

identify any source of cash other than proceeds of Second Lien Collateral.  And

while Appellees quibble with the Second-Lien Holders' characterization of their

witness's (Mr. Griffith) testimony on this point, they concede that Mr. Griffith "did

not know" and said he would "have to speculate" when asked what other sources

of the cash there could conceivably have been other than proceeds of Second-Lien

Collateral.  Consequently, exclusion of cash from Second-Lien Collateral due to a

lack of tracing was error.

     The bankruptcy court also erred in failing to take into account that, even if the

cash were not collateral for the Second-Lien Debt, it was unquestionably collateral

for the First-Lien Debt, and therefore available to satisfy the Debtors' first-lien

obligations and reduce dollar-for-dollar the amount of debt senior to the Second-

Lien Debt.  Appellees attempt to defend the bankruptcy court's invocation of the

doctrine of marshaling on this point, Appellees Brief at 63, but the bankruptcy

court plainly misapplied that doctrine here.  The DIP Agreement required the

Debtors to use the cash they received to pay down all first-lien advances, providing

for a cash sweep that ensured that all cash of the Debtors would, first, be used to

pay down the First-Lien Debt, thereby reducing the First-Lien Debt senior to the

Second-Lien Obligations.  Second-Lien Brief at 78-79.  Appellees do not even

address (and therefore implicitly concede) this point, which alone makes clear that

the bankruptcy court erred in failing to account for cash within the Second-Lien Collateral.

Moreover, Section 4.1(b) of the Intercreditor Agreement provides that all collateral received by either party shall be applied first to the costs and expenses of the ABL Agents and then to the payment of the First Lien Debt.  A-4990.  And once the First Lien Debt is paid off, Section 4.1(d) of the Intercreditor Agreement requires that the First Lien Agents deliver to the Second Lien Agent such documents as the Second Lien Agent requests to enable the Second Lien Agent to have control over "Control Collateral," which includes deposit accounts, constituting Second-Lien Collateral.  A-4990-4991.

## III.  THE BANKRUPTCY COURT ERRED IN RULING THAT THE PLAIN TEXT OF THE APA CREATES A $50 MILLION CAP ON ESL'S RECOVERY ON ACCOUNT OF ITS CLAIMS UNDER SECTION 507(B) OF THE BANKRUPTCY CODE[7]

The bankruptcy court's misinterpretation of Section 9.13 of the APA as creating a $50 million absolute cap on the total amount ESL is permitted to recover on its Section 507(b) Claims is contrary to the plain text of the APA, the structure of the Sale Transaction as a whole, and the Parties' shared understanding during the drafting of the APA.  Appellees' arguments otherwise cannot cure the bankruptcy court's erroneous reasoning.

---

[7] Wilmington Trust and Cyrus take no position with respect to this issue.

38

*First*, Appellees argue that the term "Claims" "is sufficiently broad to encompass any possible right to payment," and "reading Claims as covering only a claim asserted in a legal proceeding" would render the term "causes of action" redundant in violation of the rule against surplusage.  Appellees Brief at 66 (citing *Conway Hosp., Inc. v. Lehman Bros. Holdings Inc.*, 531 B.R. 339, 342 (S.D.N.Y. 2015)).  Just the opposite, under Appellees' own reading of the term, "Claim" would be redundant with "causes of action" to the extent "Claim" already includes any possible right to payment.  In fact, as ESL explained in the Second-Lien Brief at 79-84, the general canon against surplusage counsels against the bankruptcy court's broad interpretation of the cap as it would render the entire second half of Section 9.13(c)(ii) superfluous.  *See* Second-Lien Brief at 82.

*Second*, even if the broad definition of "Claims" that Appellees assert is correct, it still does not encompass all property of the Debtors or their estates. Among Sears' principal assets was inventory and other tangible personal and real property.  None of that is a "cause of action' or a "Claim."  There is no justification for the bankruptcy court's ruling that ESL's Section 507(b) Claims are capped to $50 million from *any* assets that are property of the Debtors or their estates.  A-4805 (245:10-19).

*Third*, Appellees continue to confusingly insist that, even if ESL's interpretation of "Claims" is correct (it is), ESL's recoveries are limited to $50

million from the non-ESL causes of action, and ESL can recover *nothing* from any

source other than those causes of action.  Appellees Brief at 66.  Appellees'

interpretation is plainly wrong.  Section 9.13(c) expressly authorized ESL to assert

any claims it may have "arising under Section 507(b) without any dollar limit.  It

then contains two, and only two, contractual limits on distributions on those

claims—that no such claims (or any other claims of ESL) shall have recourse to

the proceeds of Specified Causes of Action and that any ESL Section 507(b)

claims shall be "entitled to distributions of not more than $50 million *from the*

*proceeds of* any Claims or causes of action of the Debtors or their estates."

A-1628-29 (APA § 9.13) (emphasis added).  Appellees' purported reading of this

section would only be consistent with the plain text, if the words "solely" or

"exclusively" appeared before the word "entitled," or if the provision included as a

final clause that "ESL shall not be entitled to any distributions on any Section

507(b) claims from any other source."

*Finally,* Appellees' claim that Section 9.13(c)(iii)—which waives ESL's

right to object to confirmation of a Chapter 11 plan on the basis of any outstanding

Section 507(b) claims—somehow proves that ESL agreed to an absolute $50

million cap on its Section 507(b) recoveries is wholly illogical.  Appellees Brief at

68.  Indeed, clause (iii) proves exactly the opposite.  If ESL were *only* permitted to

recover from proceeds of other litigation causes of action—entirely speculative

distributions to the estates that will arise, if ever, long after plan confirmation—it would be entirely unnecessary to include clause (iii), because there would be no concern that any ESL Section 507(b) Claims could otherwise delay confirmation of a plan.

## CONCLUSION

For the reasons stated above and in the Second-Lien Brief, the Second-Lien Holders respectfully request that the 507(b) Order be reversed and the case be remanded to the bankruptcy court for further proceedings.

Dated:     New York, New York
             December 23, 2019

CLEARY GOTTLIEB STEEN & HAMILTON LLP

By:   */s/ Thomas J. Moloney*
       Thomas J. Moloney
       Sean A. O'Neal
       Andrew Weaver
       Katherine R. Lynch
       Chelsey Rosenbloom

       One Liberty Plaza
       New York, NY 10006
       Telephone: (212) 225-2000
       Facsimile: (212) 225-3999

          - and -

WILMER CUTLER PICKERING HALE AND
DORR LLP

By:   */s/ Philip D. Anker*
        Philip D. Anker

        7 World Trade Center
        250 Greenwich Street
        New York, NY 10007
        Telephone:  (212) 230-8800
        Facsimile:  (212) 230-8888

        *Attorneys for ESL*

MILBANK LLP

By:   */s/ Thomas R. Kreller*
        Eric R. Reimer (admitted *pro hac vice*)
        Thomas R. Kreller (admitted *pro hac vice*)
        Robert J. Liubicic

        2029 Century Park East, 33rd Floor
        Los Angeles, California 90067
        Telephone:  (424) 386-4000
        Facsimile:  (231) 629-5063

        *Attorneys for Cyrus Capital Partners, L.P.*

42

SEYFARTH SHAW LLP

By: ___*/s/ Edward M. Fox*_____
　　　Edward M. Fox
　　　Steven Paradise
　　　Owen Wolfe

　　　620 Eighth Avenue
　　　New York, NY 10018
　　　Telephone:  (212) 218-4646
　　　Facsimile:  (917) 344-1339

　　　*Attorneys for Wilmington Trust, National*
　　　*Association, as indenture trustee and*
　　　*collateral agent*

43

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Federal Rule of Bankruptcy Procedure 8015(a)(7)(B)(i), and the Court's December 20, 2019 Order granting the Second-Lien Holders' Motion for Leave to File Excess Pages, because it contains 9,733 words, excluding the parts of the brief exempted by Federal Rule of Bankruptcy Procedure 8015(g).

2.      This brief complies with the typeface requirements of Federal Rule of Bankruptcy Procedure 8015(a)(5) and the type style requirements of Federal Rule of Bankruptcy Procedure 8015(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated:  New York, New York
        December 23, 2019


                    By:  */s/ Owen R. Wolfe*_____
                         Owen R. Wolfe

44